The first case this morning is 5-220-576, Bankston Creek Corp. v. MK International, LLC. Arguing for the appellant is Courtney Cox. Arguing for the appellee is Blaine Osmond. Each side will have 15 minutes for the argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, Counsel. How are you all? Good morning, Your Honor. Doing well, Your Honor. Good morning, all. Nice to see you, too. Before we get started, I believe there was a motion to strike at least maybe portions of the reply brief. The objection was filed. The panel will take that up with the determination of the case. I believe that's what our discussion was. Is that correct, Justice Barberos and Justice Cates? Yes. Yes. Okay. Ms. Cox, you ready to proceed? I am, Your Honor. We'll go right ahead. Good morning. May it please the court. This is one of the more interesting cases I've been involved with for a long time. And a part of it because it involves a specialized product. It's called spent bed bottom ash. And I call it bed ash just for short. And it's undisputed this product is only created and found one place in the world. It has only one source, and that is from a particular unit called the Fluidized Bed Boiler at Southern Illinois Power Company's generating station in Lake Egypt, Illinois. So this can only be found there and can only be purchased from there. It's actually used for coal mines mostly to put on the floor of the coal mine to absorb moisture and is purchased for coal mines for that purpose. This case involves two connected contracts. One is the contract between this company called Bankston Creek and my client, MK International. The second contract is the contract between Bankston Creek and SIPC, the power company. And both of them involve the purchase and sale of the unique bed ash that's produced by SIPC. The contract between Bankston and SIPC gave Bankston the exclusive right to purchase the bed ash from SIPC for use in coal mines. My client's contract with Bankston gave it the exclusive right to purchase that unique bed ash from Bankston for the same use in coal mines. The Bankston SIPC contract was incorporated by the agreement of the parties into the contract with MKI. And we see that in paragraph two of the MKI agreement where it specifically references the SIPC agreement and explains in detail its impact on the MKI contract. And that paragraph provides in the event the Bankston's contract with SIPC is extended, it would be extended in the MKI contract as well. In other words, if you extend one contract, the other one is automatically extended. There's another provision where it references the SIPC agreement as well. And it says in the event any changes are made in the SIPC agreement, such changes would be incorporated into the MKI. So they're intertwined in that sense by agreement of the parties that if the SIPC contract changes either by length or any other terms, it changes the MKI agreement in the same fashion. Now, the trial court noted there is an integration clause in the MKI contract, but we submit that that does not operate here. And the reason is we're not asking to bring in any outside agreements that were not included. We're saying that in the MKI contract, it expressly recognizes the effect of any changes in the SIPC contract and how it would affect the MKI contract. And they clearly designed the MKI contract so it would be the same length and have any of the same changes that were in the other contract. There was some confusion, I think, about ambiguity. We do not contend that the MKI contract, the contract my client entered into with Bankston, is ambiguous. It is not ambiguous. It's very clear about the exclusivity. But there is an ambiguity in the SIPC contract, which we talked about, and that ambiguity is how long does the period last that Bankston has to sell exclusively? And the way it works is when you look at the SIPC contract, and it was actually developed and formulated by the party, so it's a little unclear, but the SIPC contract contains an initial five-year period during which Bankston had the exclusive right to sell the bed ash for use in coal mines. That is undisputed. The trial court permitted testimony on this issue of the length of that exclusivity period, and there was an issue about it because there were extensions of the contract that were entered into by the parties. And the important testimony came from the owner of Bankston Creek, whose name is Jim Brown, and also from SIPC's vice president, a man named Leonard Hopkins. Both of them admitted under oath that the first five-year period of the SIPC contract, during which there is an exclusive right to sell the coal mines, had been extended to encompass the entire time period of the MKI contract. That was through March 31, 2019. So both of them admitted that the first five-year period extended, and that was an exclusive period, extended through the entire time of the MKI contract. There's testimony in the record at page 424 by Jim Brown, where he specifically testifies that the extension continued that first five-year period. Leonard Hopkins also testified to that. And in fact, attorney Ron Osmond, who was actually testified in this case, although he was the attorney for Bankston, he admitted that the entire contract was extended, which would have included the first five-year period of exclusivity. And these admissions by Brown and Hopkins and Mr. Osmond make sense, because if Bankston had not been the exclusive purchaser of the bed ash for coal mine purposes, it would have been impossible for Bankston to then agree with MKI that it would have exclusive rights to purchase bed ash for use in coal mines. The other thing is, in addition to these admissions, it's undisputed that Bankston and SIPC both treated the contract with SIPC as exclusive for three-and-a-half years after that five-year period. In other words, for eight-and-a-half years, from October 1, 2008, until May 2017, when SIPC first began selling to JMO, that they treated it as exclusive. And in fact, in April of 2017, when this other company called JMO wanted to buy directly from SIPC, Mr. Hopkins wrote an email to the person who wanted to buy the product directly. He said, in reviewing our contract with Bankston Creek, we might be obligated to sell bed ash only through them. We wanted a third party to handle this product. Therefore, there is a problem, exclamation point. In fact, Mr. Hopkins testified, even during the spring and summer of 2017, SIPC wanted to continue the process of selling for coal mines through Bankston only. And during that entire time, if someone wanted to buy bed ash, Mr. Hopkins would refer them to Bankston. That's his testimony. In fact, when this company called Crown, who was a customer of my client, MKI, wanted to buy the bed ash, Hopkins said it was a concern because he was trying to bypass things and essentially cut out the middleman, so to speak. Of course, the middleman was my client, MKI, who was buying it and selling it to Crown. So when SIPC began selling directly to Crown and cutting out both Bankston and MKI, why didn't Bankston complain or take steps to stop this violation of its exclusive agreement with SIPC, especially since it was going to cost Bankston over $90,000 a year in yearly bed ash profit? Crown admitted that under the agreement, SIPC can only sell bed ash to others directly in the third period of the contract, which they never reach. The answer to this puzzling question as to why Bankston wouldn't try to stop SIPC from selling directly in violation of its agreement with Bankston came from questioning by Mr. Osman of a man named Mike Orr. Mike Orr was the owner of JMO. And Mr. Orr explained that what happened was Mr. Orr wanted to buy the bed ash for less than $15, which is the going price, 15 a ton. And he thought he could get it less by buying it direct. Mr. Hopkins told him that he cannot do that. He has to charge him $15 just like he would buy it from Bankston because Bankston was being paid a stipend. In other words, Bankston was receiving a share of the $15 per ton that it was previously getting. And the way it worked before was they would sell a ton, Bankston would get half of the money, and SIPC would get half. And they continued that on. And Orr's testimony is clear. The reason they're doing that is because Bankston's still getting its money, still making its profit. That means that my client's the only person cut out as the middleman by these direct sales and explains why Bankston would not do anything to stop it. So at one point, Mr. Black, Bob Black, who runs MKI, he asked Mr. Brown, how could this happen? I thought your contract was exclusive. And Mr. Brown responded to me, well, I thought so too. So they're trying to figure out how to stop this. And Mr. Brown suggests this to Bob Black. He says, why don't you buy all of the bad acts? In other words, if you buy it all, they won't have any to sell to anybody else. Of course, the agreement with SIPC does not require Bankston to buy it all. But Bob Black, desperate to save his business, agreed to that. He said, okay, I'll buy it all. And what I don't use, I'll get rid of. But to save my business, I'll buy it all. He agreed with that. And at that meeting, he agreed he would buy all of it. The next morning, though, Jim Brown added to that, in addition, you have to buy all of it and give a bond for $1 million. This is the first time any bond had been mentioned. And the requirement of buying all of the bad acts fell apart because of the bond. Interestingly enough, Mr. Brown admitted that SIPC didn't tell him he needed a bond. And Brown never even discussed purchasing all the bad acts with options. That would have ruined his getting the stipend. Well, let me ask you this. With regard to buying all of the bad acts, when that discussion came up, does that not suggest that there's not a complete exclusivity there? If MKI is only buying a certain – it's MKI that's buying the ash and has been told, hey, you need to buy it all, so that no one else can buy any, right? So then how is it that if they weren't already buying all of it, what was being done with the rest of it? Well, Judge, here's what was being done with the rest of it. One of two things. SIPC could sell to anybody else in the world for non-coal mine purposes. This is only for coal mine. And the other reason was they would just take it out and get rid of it, and they would have to pay to get rid of it. That's why they were selling it. So by buying all of it, it prevented them from selling to Crown because there wouldn't have been any to sell it, right? So that's the reason. And there's other uses. I'm assuming that the other sales outside of coal mining use was minimal. Yeah, I believe it was. It wasn't – it was not – the majority was for coal mines, for sure. Gotcha. Mr. Cox, the court didn't – all of the testimony that you're talking about that's extraneous to the contract, it seemed to me that the court wasn't interested in that. Well, I think the trial court was not interested in the discussions that took place before the MKI contract was entered into and said that was parole evidence. All the evidence I've been talking about is what happened after – what the parties did after that contract was entered into in terms of violating the contract or refusing to enforce the contract. So the trial court's focus on the parole evidence was what was being said before the contract was entered into. We're not looking at that evidence here, but rather what transpired afterwards in the failure to enforce the agreements. But the trial court seemed to disagree with your analysis, that Paragraph 2 incorporated the SIPC contract into the Bankston Creek and your client's contract. That's absolutely correct, Your Honor, and it was error for the trial court to do that because the MKI contract by agreement of the parties specifically incorporates the SIPC contract into it by making it depend upon its length. The SIPC contract controls the length of the MKI contract, and other terms in the SIPC contract also could control what the terms are in the MKI contract. So they were designed to be dependent on the SIPC contract. But if you take that hypothetically as you've described it, then that clearly could bind Bankston Creek. But how does that bind SIPC? They're not a party to this at all. They haven't been involved in the negotiation. They don't know what's going on. Well, first, Judge, they were a party until they were dismissed out, and that's a part of our appeal. They were dismissed, we think, improperly by the trial court. They were a party. No, I mean a party to the contract. They weren't a party to the contract between BCC and MKI. That's correct. But Bankston was a party to both contracts, and Bankston's exclusivity in the MKI contract depended completely on the SIPC contract. Which is why you can bind BCC under both, theoretically. But how do you bind SIPC when they're not a party and weren't involved in your client's negotiation? Bankston was in a position to require SIPC to honor its contract. That's why we're suing Bankston. Bankston failed to enforce its contract with SIPC, which it could have done. It could have prevented and maintained the exclusivity of MKI and prevented these sales had it enforced its agreement with SIPC, but it failed to do so, which is our claim against Bankston. And they had every right to do so, and when we tried every way in the world to get them to do that, they simply refused to do so, even though they could have done so. So that's how the SIPC contract becomes important in this case. It's what could have been used by Bankston to preserve the exclusivity of its agreement with my client. I see my time is – and if I haven't answered your question, I'll be glad to address it. No, that's fine. Thank you. Thank you. Thank you, Judge. And obviously, Mr. Cox, you'll have your time for rebuttal, but before we move on to Mr. Osmond, Justice Barberis or Justice Gates, do you have any further questions at this time? Not at this time. No. All right. Thank you, Mr. Cox. Mr. Osmond, go right ahead. Thank you. May it please the court, my name is Blaine Osmond, and I represent the appellee in this matter, Bankston Creek Corporation. We also represent the third-party defendant, Jim Brown. I think, first, Your Honors, I'd like just to address a few things that Counsel Cox had discussed. In reference to a stipend, the testimony of Mr. Orr, who is not part of this lawsuit, he was a witness that was called, but he's for a company called JMO, and previously that was Freedom. He is not a part of this. He is not a member of SIPC. That is the only person in this whole trial that said anything about a stipend that was being paid to Jim Brown or to BCC. That is not the case. The testimony has shown that BCC and Jim Brown never received any type of stipend or money for anything that was sold to another party, and also Leonard Hopkins confirmed that in his testimony. The second part in reference to the integration, I'm sorry, in reference to the specific portions of the BCC MKI contract being referenced in paragraph 2 with the SIPC contract was just for a specific reason in reference to it being extended. There was no language that specifically incorporated, and also that the SIPC BCC, I'm sorry, there's lots of letters here, contract was almost nine years, was entered into almost nine years beforehand, and the trial court correctly found that there wasn't an incorporation of these contracts, that they were signed on different dates, that they're separate, there's different parties involved. Mr. Osmond, BCC was the kind of middleman party who was involved in both contracts. Yes, Your Honor. So, if BCC promises exclusivity to MKI, why can't MKI enforce that against SIPC? Why can't MKI sue to do that? Well, Your Honor, the MKI BCC contract was exclusive only in that BCC had promised not to pay or not to sell any of that product to anybody that would then put it into coal mine use. In reference to the exclusivity for SIPC, there was no exclusiveness between SIPC and BCC as far as that product. The first five-year term of their contract, and I'm talking about the SIPC-BCC contract, ran from 2008 to 2000, and well, actually, there was a six-month testing period, and it ran till 2014, and that was the first five years where it was exclusive. After that, BCC had a right of first refusal in reference to if anyone wanted to come and buy this product from SIPC, SIPC would then offer it up to Bankston Creek, and there was testimony to that nature. They were trying to, in the beginning, that this wasn't a market for this. There was testimony that there's 50,000 tons annually that's produced of this material, and, of course, SIPC wanted to find a market for this because otherwise they were taking it to a reclamation project that was costing them money to haul. So, of course, they wanted to sell to as many people as they could, but in reference to your honors question about being exclusive, the exclusive portion in what BCC did was only that they promised they wouldn't sell this product to anybody else who was putting it in the coal mines, and they didn't do that. They only sold them to who they were supposed to. I believe that the trial court correctly found that when you look at the trial transcript and the court judge's order that, of course, it's not an ambiguous contract. The contracts were not incorporated. There was no exclusivity in reference to SIPC. I'm sorry. There was no exclusivity in reference to the contract between NKI and BCC except for that BCC would not sell that product to anybody who was going to use it for coal mines, which they did not do, and there was no evidence that they did do that. How do you define exclusivity? I mean, if you're not going to sell it to anybody but coal mines, is that exclusive as to coal mines? I mean, how are you defining that word? Well, Your Honor, if you look at in the contract, there was a provision in Section 7 for the use of the purchased material in SBBA, and there is no mention of the word exclusive in the BCC-MKI contract. What it states is that the parties acknowledged that what they were going to do and that the purchased material was going to be marketed in North America and South America specifically for coal mines, but then if you look through that paragraph, seller may market and sell precast concrete products utilizing SBBA or a fraction thereof, and any such products may be sold to coal mines in North America and South America, and the seller, and in this case it's BCC, may also market SBBA and engineering applications on non-coal mine. The agreement was that BCC could then continue to find markets for this product outside of the coal mine use, but that anything that was being purchased by MKI would be for use in coal mine, and therefore BCC wouldn't sell anything to anyone else who would be taking it to put it into the coal mine process. Well, isn't that an exclusive provision as to coal mines? Yes, that is exclusive as to coal mines, and the evidence was that my client never sold anything to any coal mines, Your Honor. Okay, but you said there's no exclusivity in the contract. It seems to me there is some exclusivity there. Well, there's no mention of the word exclusive in that one, and I would say that in this instance that would be the only time, but that applies to BCC and their selling of it, and there was no evidence that my client ever sold anything to anyone for coal mine use. When you're reading of the contract provision with regard to exclusivity, you mentioned the word specific or specifically could have had exclusive as that word as well. The provision you just read. Yes. Well, I think in this case, I mean, there was the matter of. I'm sorry, Your Honor. You've seen in reference to that there was the word specific in there? Yes. Yes. Well, I mean. Specific to coal mine use as opposed to saying exclusive to coal mine use. I'm looking at it as nearly a synonym for exclusive. And in that case, but that doesn't have anything to do with what we're here for today because of SIPC being involved and where the rub became was that we're in the second five-year contract where it's a match and that's essentially a right of first refusal. And what happens is that when someone else would come to purchase it, we then have a dispute about what happened, and that's where we come up with what Mr. Cox had discussed with between Mr. Brown and Mr. Black to purchase all of the product. And that would therefore cut anybody else out. Of course, that would have been quite a bit of product. It sounds like that would have been approximately 50,000 tons a year. And in reference to Mr. Brown's testimony in reference to the bond was because anything that they would not have to use, they would have to dispose of. And that was going to be an issue. When did the contract get amended to write a first refusal? Between SIPC and BCC contract was always that way. Your Honor, in reference to the first five years of the contract were to be exclusive. And upon the second five years, it was then going to be essentially a price match, that they would match anybody between that time and contact them. Mr. Cox had discussed about the extension of the first five-year period. It's an inaccurate reading of what had taken place in that. There was an extension of the agreement, but that was only extending the 2008 agreement between SIPC and BCC as they contemplated in a contract for that second five-year period. Now, after after 10 years, SIPC could then market it however they wanted. And the contract would end. What they contemplated, what was contemplated by BCC and MKI was, and what happened is that BCC sought an extension of an additional three years under the terms of the contract. And so it would have been the price match at that time, which was granted. But we don't get to that case or get to that point because everything went down. I think I also would like to point out that when Mr. Cox talks about Crown coming in, Crown came in because they were invited by MKI. Evidence shows that, who then essentially took all of MKI's business after touring their facility and seeing what they were doing and essentially doing an end around on them. But there wasn't, that's of no fault for BCC. BCC didn't have anything to do with those conversations, nor did Jim Brown. Well, Mr. Cox had mentioned the fact that the exclusivity of the contract extended was essentially recognized and followed through for eight and a half years. So is that not some kind of an indication that that exclusivity was, that that five-year term was extended? It's not, Your Honor, because in that case, SIPC wanted an engineering firm to handle this product because in the beginning in 2008, and there's testimony to this by Leonard Hopkins, they had a product. Of course, it comes from a power plant and they were concerned with environmental reasons. And the SIPC, it was in testimony, wanted to have a layer of protection that someone was testing this under the rules of the Illinois Environmental Protection Agency that they, so they could have records that this wasn't a hazardous product. And so that's why they brought in BCC and Jim Brown to be able to do that. And at that time, they were just continuing to run it through and no one else had been calling them generally in reference to wanting this product, besides Mr. Brown and of course through Freedom. So they were, they were essentially operating under that. And after they'd been going for so long, after eight or half or nine years, I think it was testimony that Leonard Hopkins said that by that time they had all the safe records, so they felt more comfortable with selling it to other people outside of just BCC. I believe the trial court was correct and they did exclude quite a bit of parole evidence that take place in this rather than look just at the four corners of the document. And I believe that was correct by the trial court to do that. There was no incorporation between the SIPC and BCC contract. And the court was correct in all of their rulings in reference to denying all the affirmative defenses and counterclaims because the court correctly saw or ruled that the premise for those was based on the, essentially the false fact that the contract was exclusive for SIPC. I mean, excuse me, between BCC and MKI. And I'm sorry, Your Honor, if I may, I was just going to look. In closing, Your Honor, thank you for your time, but I believe that the trial court and Judge Gaufinet made a correct ruling in this case in finding for BCC on their breach claim and finding damages and then also with the nine counts, one and two of the counterclaims by MKI. And we would ask those be affirmed. Thank you, counsel. Before we move on to Mr. Cox, Judge Cates or Judge Barbera, do you have any questions for Mr. Osmond? No. No, thank you. Thank you, Your Honor. Mr. Cox, go right ahead. Thank you, Your Honor. Let me first address the comment made several times by Mr. Osmond that SIPC was not selling this product for use in coal mines. The opposite is true. JMO was purchasing and then reselling it to coal mines. Crown was a customer of MKI and Mr. Hopkins knew that. And so Crown was specifically buying it from SIPC and selling it for use in underground coal mines. So all of these sales outside directly, not to banks that were for coal mine use. They were never in the second period, this right of first refusal period. And that's demonstrated, as Judge Barbera pointed out, by the fact they continue to treat it as exclusive to Bankston eight and a half years later. Plus, we have the testimony, specific testimony of Jim Brown. He was asked this. So you are saying that we're talking about the first five year period, that the extension continued the first five year period until March of 2019? Answer, yes. And the same was with Mr. Hopkins and the same with Attorney Osmond, that it was continued. And that's how the parties acted. Now then, so they were never in that second year period. This stipend was elicited in testimony by Mr. Osmond from Mike Orr, who was the owner of JMO. And so the question of whether or not it was exclusive, when we look at the MKI contract and paragraph seven, it says BCC, Bankston, agrees not to sell any SBBA bedash to any other person or entity for utilization in coal mines in North America or South America during the terms of this agreement. Now, I don't know how much plainer you could be about the exclusivity for the use in coal mines. It goes on to permit Bankston to sell for other purposes, but it's absolutely clear it's exclusive for that. In terms of the incorporation, the question of whether one contract's incorporated into the other, I don't know what the parties to the MKI contract could have done to make it any more incorporated. They tied the MKI contract to the SIPC contract in terms of its length, any extensions, and also any other changes they made in it. It's hard to imagine how much more incorporated they could expressly make it, and that's what they did. Here's the thing to keep in mind. When JMO came to Leonard Hopkins and wanted to buy directly from SIPC, and when Crown came to Mr. Hopkins and wanted to buy directly from SIPC, in both instances, initially, Mr. Hopkins, this is in the spring and summer of 2017, said, No, I cannot sell it to you. You have to go through Bankston. You have to buy it from them, which would have meant they had to buy it from MKI because of our exclusive agreement. Instead, later after that, around the end of the summer, SIPC changed its mind and said, No, we'll sell directly to you. We know you're buying it for coal mine use, but we're going to sell it directly to you. Let me stop you for one second, Mr. Cox. Just for clarity purposes, did SIPC actually acknowledge that if they were to sell directly to the other company, it was for coal mine use? Is there some testimony that's in the record that they acknowledged that that was what it was going to be for? Well, Mr. Hopkins acknowledged that he knew that Crown was a customer of MKI and that MKI was selling it to Crown for use in coal mines. He acknowledged that. And so there's no question that they knew this. And as a result, when they began selling directly to Crown, MKI lost all its customers. That's what they went through to go to their customers. And when that happened, they were out of business. They had no use for Bedash. They couldn't buy it. And to save that, they offered to buy all of it, which was the only way it could work. And that fell apart. So there's no doubt the parties knew it was for underground coal mine use. And of course, they knew JMO was doing that as well, because that's what JMO had always done, sold to coal mine use. And so there's no question that there was this change suddenly. First of all, they said, we can't sell it to you, go through Bankston. Then they said, oh, we can. And when that happened, that was the end of MKI. Mr. Cox, let me ask you about damages. I don't understand exactly how the court calculated these damages. It seemed to presume that 1,000 tons were delivered every month. But the testimony may be to the contrary on that. What do you have to say on damages? Thank you for asking about that, Judge. The contract required purchase of 1,000 a month. If there was 1,000 to have, and there was testimony, Judge, that very often, or at least on some occasions, when MKI went to pick up or Bankston went to pick up Bedash, there wasn't any available. It was gone. It had been either taken out and disposed of or just wasn't there, or maybe hadn't been created. And so it was very unclear. And there was no proof as to how much was available on each month. So just to presume that it's 1,000 would be contrary to that evidence. And is that what the court did make that presumption? It appeared to me that's what the court did. Okay, thank you. Thank you, Judge. Was there not something in the record, and correct me if I'm wrong, that suggested that while certain times there may not be the 1,000 tons, but other times there were more than that would make up for it on a yearly basis that would even out to 1,000 tons a month? Well, I don't know that the analysis could be about evening it out. And here's the reason, Judge. If you have a month in which you have more than is sold, they dispose of it. So it's not like they accumulate it and have it available in the next month. Because what they would do is take, they would have to pay to dispose of it. But they did that as my understanding on a monthly basis so they didn't have a way to stockpile it, in other words. Okay. Thank you. Justice Barberis or Justice Cates, do you have any final questions before we let counsel go for the day? None. I don't. Thank you. Thank you, Your Honor. Obviously, we will take the matter under advisement, we will issue an order in due course.